## AFFIDAVIT IN SUPPORT OF APPLICATION FOR WARRANT

Your affiant, Logan Tyner, Border Patrol Agent of the United States Border Patrol, being duly sworn, does depose and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Border Patrol Agent with the United States Border Patrol ("USBP") permanently assigned to Nogales, Arizona and detailed to Tucson, Arizona with the Prosecutions Unit. I have been an agent with the USBP since July 26, 2010. I completed the USBP Academy in December 2010, where I received instruction in constitutional law, immigration law, criminal law, and federal and civil statutes. I have also received instruction in the detection, interdiction, and arrest of narcotics smugglers, alien smugglers, and aliens illegally present in the United States.

2. As a Border Patrol Agent, I work routine field agent duties patrolling the Nogales Area of Responsibility ("AOR"). I have been involved in many apprehensions of undocumented aliens, alien smugglers, narcotic traffickers, and facilitators. I have processed and presented many cases for criminal prosecution and administrative proceedings.

3. In December 2018, I was first assigned as a Case Agent for the Tucson Sector Prosecution Unit. I have conducted investigations involving illicit activity and have gathered and structured evidence and facts pertaining to administrative and criminal cases. I have taken sworn statements from material witnesses and suspects. I routinely perform record checks through various law enforcement databases to establish accuracy of information as well as to gather facts further relevant to a respective case. I have acted as a liaison between the United States Attorney's Office and field agents, and I have assisted fellow agents in the development of their cases.

4. Through my training and experience with Alien Smuggling Organizations ("ASOs"), I have learned that the utilization of cellular phones to communicate between coordinators, foot guides, load drivers, stash house operators, etc., is the most common form of communication. Cellular phones often contain evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text,

email, other electronic messaging applications, and voice mail communications between the person who possessed or used the device and others. It is quite common for navigational coordinates to also be transmitted to and/or from these devices to determine the user's location through a GPS application. In many areas of the border, scouts use cellular phones to guide the groups to the pickup locations. Drivers of scout vehicles are able to relay information to the driver of the load vehicle either with a direct call or with applications ("apps") such as WhatsApp. Scouts will relay information such as the presence of Border Patrol. Drivers can also be guided by "pin drops" on apps such as Google Maps which will contain directions for the load vehicle. ASOs will utilize several different apps and functions on their phones to facilitate the coordination of a smuggling event, all the way from initial contact with the alien to delivery of the alien at the desired location in the United States. In addition, the apps that ASOs use may vary from cellular phone to cellular phone.

5. The statements contained in this affidavit are based on information provided by fellow Border Patrol Agents, as well as my experience as a Border Patrol Agent in the USBP. Since this affidavit is submitted for the limited purpose of securing a search warrant, I have not included all facts known to me regarding this investigation. I have set forth facts that establish probable cause to believe that the defendant referred to in this investigation conspired with known and unknown individuals to transport illegal aliens, in violation of 8 U.S.C. § 1324.

6. I submit this affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the contents of a Gold iPhone, defined below as the **Target Device** defined in Attachment A, and the extraction from the **Target Device** of electronically stored information further described in Attachment B hereto.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7. The cellular phone to be examined is a Gold iPhone smart phone.

8. The **Target Device** is currently stored at the evidence vault maintained by USBP Seized Property Specialists at Casa Grande, Arizona. The **Target Device** is sealed in a Department of Homeland Security Evidence Bag, with a signed Form 6051S Custody Receipt for Seized

Property and Evidence. This evidence bag is sealed with the identification number A8992802. It is to be searched pursuant to the attached Application, as further described in Attachment A hereto. A photograph of the **Target Device**, in its current condition and in the described evidence bag, is included hereto as Attachment C.

9. The requested warrant would authorize the forensic examination of the **Target Device** for the purpose of identifying electronically stored data to include: any telephone numbers, including but not limited to, numbers called, numbers stored for speed dial, pager numbers, names and addresses, electronically-stored voice and text messages, calling card numbers, photos, videos, and/or identifying information that may be stored in the memory of the **Target Device**, as more fully described in Attachment B.

## PROBABLE CAUSE

10. On July 6, 2023, at 12:15 PM, USBP agents working near North Komelik in the District of Arizona observed a silver Audi traveling northbound on a dirt road that circumnavigates a local immigration checkpoint.

11. As agents positioned to intercept the vehicle, the Audi made a U-turn and started driving back southbound. As it approached an agent's vehicle that had its emergency lights activated, the driver (later identified as Hugo SALVADOR YAMAS, DOB x/xx/2004) drove off the road into desert terrain in an attempt to avoid agents.

12. After a brief pursuit, USBP agents observed damage to the vehicle from driving off road in desert terrain, and smoke from the Audi was observed as the vehicle came to a full and complete stop.

13. The driver was removed from the vehicle and advised he was under arrest for illegal alien smuggling in violation of 8 U.S.C. § 1324. USBP agents also arrested and detained three suspected undocumented non-citizens, including material witness Franklin LEMUS RIVERA.

14. During a search incident to this lawful arrest, it was discovered that SALVADOR YAMAS was in possession of two cellular phones: a Black iPhone 11 and the **Target Device**. In a later sworn statement, material witness LEMUS RIVERA stated that he observed SALVADOR

YAMAS using a cellular phone while operating his vehicle, but could not further describe the device or whether SALVADOR YAMAS was using more than one.

15. During post-*Miranda* custodial interviews, the suspected aliens (including material witness LEMUS RIVERA) stated that they entered the United States in separate groups between July 4 and July 5, 20, 2023. Each of the aliens' groups was assisted by a foot guide, who led the suspected aliens on foot until their arrival at an abandoned house. LEMUS RIVERA stated that he and the other individuals waited until a gray Audi Sedan arrived and honked its horn twice, signaling them to enter the vehicle driven by SALVADOR YAMAS.

16. In his videotaped deposition testimony, LEMUS RIVERA stated that he observed the driver of the vehicle using a cellular phone continuously throughout his transport.

16. In my training and experience, SALVADOR YAMAS would have only been able to find the group by using his phone to communicate with coordinators and receive directions as to where to pick up the group.

17. SALVADOR YAMAS and each of the illegal aliens had a phone on their person at the time they were placed under arrest, and each person claimed ownership of their own phones. No other devices were found.

18. During a post-*Miranda* custodial interview, SALVADOR freely admitted to using a cellular phone to accept the alien smuggling job, as well as to navigate to the pick-up location and while transporting the individuals found in his car, to take photos of the aliens, and to transmit proof of his location to a smuggling coordinator. However, SALVADOR YAMAS did not identify which of the two phones found in his possession was used in these activities.

19. During the custodial interview, SALVADOR YAMAS freely gave consent to a search of his Black iPhone 11, but did not give consent to search the **Target Device**.

20. The **Target Device** was seized from this event as evidence and is being stored by the USBP Seized Property Specialists in Casa Grande, Arizona. The **Target Device** have been stored in such a manner that its contents, to the best of my knowledge, are in substantially the same state as when they first came into possession of the USBP.

## **TECHNICAL TERMS**

21.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a) <u>Wireless telephone</u>: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b) <u>Digital camera</u>: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

   c) <u>Portable media player</u>: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video or photographic files. However, a portable media player can also store other digital data. Some portable

5

      media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

d) <u>Internet</u>: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

22. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application. In many areas of the border, scouts use phones to guide the groups to the pickup locations. This allows the guides to maintain a safe distance and insulate themselves from the group and thus evade apprehension.

## **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

23. Based on my knowledge, training, and experience, I know that electronic devices, such as the **Target Device** in this case, can store information for long periods of time. Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period

of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

24. As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Device** was used, where it was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be on the **Target Device** as more fully set forth in the factual section contained herein and because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including text messages, video, or photographs.

   b. Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically-stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant. Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular

thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of device did not have a relationship with the party.

## CONCLUSION

25. Based on the foregoing information, I submit that there is probable cause for a search warrant authorizing the examination of the **Target Device** described in Attachment A to seek the items described in Attachment B. I believe that the **Target Device** contains evidence relating to the commission of a criminal offense in violation of 8 U.S.C. § 1324, and constitutes property designed for use, intended for use, or used in committing the aforementioned crime. The examination of the **Target Device** may require authorities to employ techniques, including, but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. Because this warrant only seeks permission to examine a device already in the possession of the USBP, the execution of this warrant does not involve the physical intrusion onto premises.

Consequently, there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

LOGAN M TYNER
Digitally signed by LOGAN M TYNER
Date: 2023.11.17 09:40:47 -07'00'
_____
Logan Tyner, Border Patrol Agent
United States Border Patrol

Subscribed and sworn to telephonically before me this 17th day of November, 2023

_____
Hon. Eric J. Markovich
United States Magistrate Judge